Frances JAHNER, as Executrix of the Estate of Mathias Jahner, Deceased, and as surviving wife, and on behalf of Diane Jahner, et al., Plaintiff and Appellee,

v.

Valentine JACOB et al., Defendants and Appellants.

Civ. No. 9270.

Supreme Court of North Dakota.

March 10, 1977.

Albert A. Wolf, of Wheeler, Wolf, Wefald & Peterson, Bismarck, for plaintiff and appellee.

Dwight C. H. Kautzmann, of Bair, Brown & Kautzmann, Mandan, for defendants and appellants.

VOGEL, Justice.

This is an appeal from a judgment in favor of the plaintiff Jahner, as executrix of the will of Mathias Jahner, and against the defendants, holding that certain transfers of money and property made by Valentine Jacob, as transferor, to the other defendants as transferees, were made in fraud of creditors.

On October 9, 1973, there was a physical altercation between Valentine Jacob and Mathias Jahner. Jahner was seriously injured. Further facts may be found in *State v. Jacob*, 222 N.W.2d 586 (N.D.1974), and *Jahner v. Jacob*, 233 N.W.2d 791 (N.D.1975).

Prior to October 9, 1973, Valentine Jacob had sold all of his farmland (more than 900 acres) to his son Romanus and wife, by contract for deed dated January 31, 1973. One thousand dollars was paid down, and the balance was payable in installments over 20 years. The balance due was $59,000 and the installment payments were $2,850 each, plus interest at 5½ percent per annum. Although the contract did not so provide, the parties claimed, and the trial court found, that the sales price included machinery and livestock as well as land.

One other transfer occurred prior to the altercation referred to above. On June 4, 1973, Valentine Jacob transferred to "Romanus Jacob or Irene Weichel" the sum of $25,000.

About six weeks after the altercation, on November 19, 1973, Romanus and his wife obtained a loan of $57,000 from a bank, using the real estate as security, and paid off the indebtedness to Valentine. Valentine gave a warranty deed to Romanus and wife, and proceeded to transfer most of the $57,000 to his children by obtaining bank drafts in their names and sending the bank

drafts to them. Kasper Jacob received a draft for $9,500; Irene Weichel, $20,000; Rosemary Moser, $8,000; Anton Jacob, $9,500; and Romanus Jacob, $9,150.

After these sums were paid, the total assets of Valentine Jacob remaining consisted of a life estate in a home in Linton, probably exempt from execution as homestead, approximately $16,000 cash, and the right to Social Security payments of approximately $190 per month.

Apparently the $16,000 was used—in large part, at least—in payment of attorney fees for defending the civil and criminal actions resulting from the altercation. Some aspects of the litigation reached this court. See *Jahner v. Jacob, supra; State v. Jacob, supra.*

The life estate of Valentine Jacob in the home in Linton resulted from his conveyance of the property, subject to a life estate in himself, to Kasper Jacob on November 23, 1973, at approximately the same time he gave his children the proceeds of the sale of the farmland.

An action to set aside the conveyance of the home and the transfers of the money was commenced on April 15, 1974. Additional parties, including Rosemary and Kasper, were brought into the action by an amendment allowed on February 6, 1975.

Rosemary Moser is a resident of South Dakota and Kasper Jacob is a resident of Georgia. So far as the record shows, neither has returned to North Dakota at any time pertinent to this action. Rosemary was served by mail, and Kasper was served by personal service by a sheriff in Georgia. Both of them filed special appearances objecting to the jurisdiction of the court over them.

The other defendants assert that the conveyances and transfers were made to avoid taxes, to avoid attorney fees for probate, for estate-planning purposes, and in consideration of love and affection. They point out that Valentine Jacob was 70 years old at the time of the transfers.

The two questions before us are (1) whether the decision of the lower court, holding that the transfers were fraudulent as to the plaintiff-executrix, can be sustained, and (2) whether the courts of this State have personal jurisdiction in this case over Rosemary and Kasper.

## I. FRAUDULENT CONVEYANCES

Our decision on the first point is governed largely by Chapter 13–02, N.D.C.C., relating to fraudulent conveyances. That chapter, consisting of 11 sections, is substantially identical to Sections 1 to 11, inclusive, of the Uniform Fraudulent Conveyance Act. It was adopted in North Dakota in 1943. N.D.R.C. 1943, Chap. 13–02.

The plaintiff's cause of action is based alternatively upon Sections 13–02–04 and 13–02–07, N.D.C.C. The former provides:

"Every conveyance made and every obligation incurred by a person who is or thereby will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

The latter provides:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

The term "creditor" is defined in Section 13–02–01 as

"3. . . . a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent; . . ."

"Debt" is defined as

"4. . . . any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent."

The term "conveyance" includes payments of money. Sec. 13–02–01, subsec. 2.

Under Section 13–02–02, a person is insolvent

"1. . . . when the present fair salable value of his assets is less than the amount that will be required to

pay his probable liability on his existing debts as they become absolute and matured; . . ."

We are satisfied that Mathias Jahner became a "creditor" of Valentine Jacob, under the terms of the Uniform Fraudulent Conveyance Act, the moment Jacob committed an assault upon Jahner. While we left the point undecided in *Rozan v. Rozan,* 129 N.W.2d 694, 706 (N.D.1964), we later quoted with approval *Hansen v. Cramer,* 39 Cal.2d 321, 323, 245 P.2d 1059, 1060, 30 A.L.R.2d 1204 (1952), in *H. A. Thompson & Sons, Inc. v. Hahn,* 135 N.W.2d 166, 172 (N.D.1965), as follows:

" 'It is well settled in this state that the relationship of debtor and creditor arises in tort cases the moment the cause of action accrues.' "

This conclusion is required by the language of subsection 3 of Section 13–02–01, N.D. C.C. (Uniform Fraudulent Conveyance Act, Sec. 1), quoted above, which includes as creditors persons having unmatured or unliquidated or contingent claims. *Churchill v. Palmer,* 57 Mich.App. 210, 226 N.W.2d 60 (1974).

The trial court found that the transfers by Valentine Jacob to his children were fraudulent on two grounds. The first was that the transfers were made with actual intent to defraud a creditor, and the second was that the transfers made Valentine Jacob insolvent.

If transfers are made with an actual intent to defraud, the intent must be proved by clear and convincing evidence, but the solvency of the transferor is immaterial.

"A rich man may make a fraudulent deed as well as one who is insolvent." *Hager v. Shindler,* 29 Cal. 48, 60, 10 P. 47, 59 (1865), and subsequent cases cited in *T W. M Homes, Inc. v. Atherwood Realty & Investment Co.,* 214 Cal.App.2d 826, 29 Cal.Rptr. 887 (1963). See *H. A. Thompson & Sons, Inc. v. Hahn, supra,* 135 N.W.2d at 169, 173.

In the *Thompson* case we specifically held:

"Where actual intent to defraud, hinder, or delay creditors is proved by clear and convincing evidence, the conveyance should be set aside, even though it did not render the debtor insolvent." 135 N.W.2d at 174.

We believe that the evidence, direct and circumstantial, is sufficiently clear and convincing in this case to permit the trial judge to find that Valentine Jacob transferred his property with the intent to defraud Mathias Jahner and that the plaintiff therefore could recover under the terms of Section 13–02–07, N.D.C.C.

We also believe that the evidence is sufficient to permit the trial court to make a finding that Valentine Jacob made himself insolvent by the transfers he made shortly after the altercation. It is true, as the appellant points out, that the trial court, in order to make such a determination, must have found that the reasonable value of Mathias Jahner's claim against Valentine Jacob, at the time of the conveyances, which was prior to the bringing of the action to set aside the conveyances and the trial and the verdict, exceeded the value of the assets remaining in the hands of Valentine Jacob and not exempt from levy. In other words, if the remaining nonexempt assets of Valentine Jacob (the life estate in the house, if not exempt as homestead, and cash of up to $16,000) were in excess of the reasonable value of the claim against Jacob, then he would not be insolvent. However, we believe that the evidence available to the trial court, including judicial notice of its own records, permitted the court to make the conclusion it did, and that the trial court could properly find, as it did, that plaintiff could also recover under the terms of Section 13–02–04, if the transfers were made without a "fair consideration."

It is contended that "love and affection" is a valid consideration for the conveyances made by Valentine Jacob. This is a correct statement, so far as the parties to the conveyances are concerned, if there is no fraud. Love and affection is a sufficient consideration for a deed. *Trengen v. Mongeon,* 206 N.W.2d 284 (N.D.1973). But "love and affection" is not that "fair consideration" required by Section 13–02–04. As

defined by the Uniform Fraudulent Conveyance Act, a "fair consideration" involves an exchange of property or obligation which is a fair equivalent of that conveyed. Sec. 13–02–03, N.D.C.C. Under this rule, conveyances to family members for love and affection have frequently been held fraudulent as to creditors. *United States v. Murack,* 149 F.Supp. 905 (D.N.D.1957); *Baker National Bank v. Lestar,* 153 Mont. 45, 453 P.2d 774 (1969).

■ Transactions between relatives are more closely scrutinized than are arm's-length transactions between unrelated persons, and once a creditor shows a lack of "fair consideration," the defendant has the burden of going forward with evidence to prove solvency in order to avoid the presumption of fraud. *United States v. West,* 299 F.Supp. 661 (D.Del.1969); *Smith v. Poppen,* 57 S.D. 25, 230 N.W. 229 (1930).

■ This is not to say that a transfer between related persons is necessarily fraudulent. There may be financial transactions between family members as between strangers, and if there is a "fair consideration," for example, the satisfaction of an actual antecedent debt of equal value, a debtor has as much right to prefer a creditor who is a family member as he has to prefer any other creditor who is not related to him. *Watson v. Goldstein,* 174 Minn. 423, 219 N.W. 550 (1928); *Reen v. Berton,* 115 N.H. 424, 342 A.2d 650 (1975). See Section 13–01–03, N.D.C.C., as to right to prefer creditors.

In the case before us there is no claim of any consideration other than love and affection. Therefore, the court was entirely correct in finding that there was no "fair consideration," as that term is defined in Section 13–02–03.

We affirm the judgment of the district court on the issue of the fraudulent conveyances.

## II. PERSONAL JURISDICTION OVER NONRESIDENT DEFENDANT–TRANSFEREES

We come now to the question of personal jurisdiction over nonresident recipients of fraudulent conveyances who, so far as the record shows, had no knowledge of nor participation in the conveyances until the bank drafts were received by them in other States.

Jurisdiction over nonresident defendants is governed by Rule 4, N.D.R.Civ.P.

At the time the action to set aside the conveyances was commenced, Rule 4 was in the form set forth in *Hebron Brick Co. v. Robinson Brick & Tile Co.,* 234 N.W.2d 250 (N.D.1975). In that case a history of the rule is given. Since that time, it has been further revised, in ways not particularly relevant to this case. The revisions were effective on January 1, 1976.

■ In *Hebron Brick, supra,* we held that Rule 4 was ". . . designed to permit the state courts to exercise personal jurisdiction to the fullest extent permitted by due process"; that it is not necessary to find that a nonresident defendant was doing or transacting business in this State before our courts can exercise personal jurisdiction; and that "All that is required under Rule 4(b), N.D.R.Civ.P., is that the nonresident defendant have sufficient minimal contacts with North Dakota to permit our courts to exercise personal jurisdiction without offending the basic requirements of due process. The focus of Rule 4 is on the defendant's contacts with North Dakota." 234 N.W.2d at 255–256.

Finally, we held that ". . . each question of personal jurisdiction must be decided on a case-by-case basis depending upon the particular facts and circumstances of each case." 234 N.W.2d at 257.

■ When we search for the contacts, minimal or otherwise, of Rosemary Moser and Kasper Jacob with the State of North Dakota, we find none. So far as the record shows, they were living in their out-of-State residences and received in the mail gifts from their father, all without any prior knowledge or participation by them.

The plaintiff-appellee, the executrix of the Jahner estate, argues that Rosemary

and Kasper either (1) participated in the commission of a tort causing injury to another person or property within this State [Rule 4(b)(2)(C)], or (2) transacted business within this State [Rule 4(b)(2)(A)], or (3) at the moment of the mailing of the bank drafts to them from a postoffice in North Dakota, owned, had an interest in, or possessed property in this State [Rule 4(b)(2)(E)].

■ We find little merit in any of these arguments. There is no showing that Valentine Jacob acted as their agent in any respect, nor that anyone else did so. No business was transacted in this State in their names, or by them, either directly or through an agent. While we have determined that a tort was committed in this State, there is no proof whatever that they participated in, or had knowledge of or responsibility for, the commission of that tort. Nor is there any proof that they owned, had an interest in, or possessed property in this State. The property which they received in their home States of South Dakota and Georgia was, to all appearances, a gift to them from their father. To be effective, a gift must be delivered. *In re Kaspari's Estate,* 71 N.W.2d 558 (N.D.1955); *McGillivray v. First National Bank of Dickinson,* 56 N.D. 152, 217 N.W. 150 (1927). The delivery took place in Georgia and in South Dakota.

The parties cite no cases in point. The case most nearly in point which we have been able to discover is *Marra v. Shea,* 321 F.Supp. 1140 (N.D.Cal.1971). In that case, as in this one, several defendants were sued to recover property fraudulently conveyed. Jurisdiction over nonresident defendants was claimed under a California statute providing that courts of that State might exercise jurisdiction on any basis not inconsistent with the Constitution of California or of the United States. It was held that one who was made a joint tenant with the alleged wrongdoer in bonds purchased with the proceeds of the wrongful act, and who had at all times resided outside the State of California and had no part in the original wrongdoing, was not subject to the jurisdiction of the California court or of a Federal court in a diversity action. Similarly, another nonresident defendant who was a cotenant in a certificate of deposit purchased by another person who had received part of the proceeds of the wrongdoing from the wrongdoer was not subject to the jurisdiction of the court. As to the latter, the court said:

"He is neither present, domiciled, nor residing in California; nor is he a citizen of California. He has neither consented to jurisdiction nor has he appeared in the action; he is not doing business in the state. He has not committed an act in the state giving rise to this cause of action, and he owns no property in California. Nor has [he] committed an act outside of the state causing an effect in the state out of which this cause of action arose, since he is not alleged to have participated with Alma R. Bang in the wrongful appropriation of community property. His only 'act' relevant to the instant cause of action is that he was a donee of an undivided one-half interest in a certificate of deposit in Tennessee. It was not this 'act' which gave rise to a cause of action under California Probate Code § 201.8, but rather the acts of Alma R. Bang in allegedly misappropriating and transferring the community property. Finally, there are no other relationships between [him] and the State of California that would make the exercise of personal jurisdiction reasonable. Plaintiffs' argument that California is the most convenient forum from the point of view of witnesses, evidence, and several of the parties is not persuasive. A court 'does not acquire [personal] jurisdiction by being the "center of gravity" of the controversy, or the most convenient location for litigation.' *Hanson v. Denckla,* 357 U.S. 235, 254, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). There must be such minimum contacts as to make jurisdiction consistent with 'fair play and substantial justice.' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). No such contacts are present in regard to [him]."

*Marra v. Shea, supra,* 321 F.Supp. at 1144.

Under some subdivisions of our Rule 4, it would be unimportant whether an "act" of a defendant "gave rise" to the cause of action sued upon; in other respects, the foregoing quotation is applicable to the case before us.

■ Generally speaking, it is conduct of the defendant which puts him within the jurisdiction of the court and makes him subject to the court's process. By transacting business in the State, contracting to supply service or goods or things in the State, committing a tort anywhere which causes injury within the State, committing a tort within the State causing injury in this or another State, owning, using, or possessing property in this State, contracting to insure some person or thing or risk within the State, or acting on behalf of a corporation organized or doing business within this State, a person subjects himself to the jurisdiction of the courts of this State. All of these categories imply voluntary conduct which makes it fair to subject the person in question to the jurisdiction of our courts.

■ In the case before us, there is no such conduct on the part of Rosemary Moser or Kasper Jacob. In the absence of such conduct, they cannot be held subject to the jurisdiction of the courts of North Dakota. The Due Process Clause "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95, 104 (1945).

■ To illustrate the status of Rosemary and Kasper, if we assumed that a thief had stolen property in North Dakota and delivered the property to a person outside the State who had no connection with the theft, we could not hold that the recipient was subject to the process of our courts. If, however, the recipient were an aider or abettor in the theft, an accomplice, a conspirator, or one who knew or should have known that he was receiving stolen goods, there might well be a basis for such jurisdiction. In the case before us there is not the slightest indication that Rosemary and Kasper participated in or had any knowledge of the commission of the acts in North Dakota which constituted fraud. We therefore hold that no personal jurisdiction over them was ever obtained.

Of course, they may be sued elsewhere in other courts. Whether they would be held liable in such other courts would depend upon the laws of the other jurisdictions. Whether our judgment finding the conveyances fraudulent would have extraterritorial effect of any kind, whether collateral estoppel would be applied, and other questions which may arise would be determined by other courts, not this one.

The judgment of the district court, so far as it relates to Rosemary Moser and Kasper Jacob, is reversed; in all other respects it is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.